1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  STEVEN C. HALAS,                )   No. EDCV 05-00180-SS
                                    )
12              Plaintiff,          )
                                    )   **MEMORANDUM DECISION AND ORDER**
13              v.                  )
                                    )
14  JO ANNE B. BARNHART,            )
    Commissioner of the Social      )
15  Security Administration,        )
                                    )
16              Defendant.          )
    _____)
17

18      Steven C. Halas ("Plaintiff") brings this action seeking to

19  overturn the decision of the Commissioner of the Social Security

20  Administration (hereinafter "Defendant," "Commissioner," or the

21  "Agency") denying his application for Disability Insurance Benefits and

22  Supplemental Security Income Benefits.  Alternatively, he asks for a

23  remand.  The parties consented, pursuant to 28 U.S.C. § 636(c), to the

24  jurisdiction of the undersigned United States Magistrate Judge.

25  Pursuant to the Court's Case Management Order, the parties filed a

26  joint stipulation ("Jt. Stip.") on December 9, 2005.  For the reasons

27  stated below, the decision of the Commissioner is AFFIRMED.

28  \\

**PROCEDURAL HISTORY**

On September 12, 2001, Plaintiff filed an application for Supplemental Security Income ("SSI") disability benefits under Title XVI of the Social Security Act.[1]  (Administrative Record ("AR") 76).  He alleged a disability onset date of July 24, 2001 due to coronary artery disease, bi-polar disorder, depression, anxiety and panic attacks.[2]  (AR 87).  The Agency denied Plaintiff's claim for benefits.[3]  (AR 48).  Upon Plaintiff's request, a hearing was held before Administrative Law Judge ("ALJ") F. Keith Varni, who issued a decision denying benefits on October 18, 2004.  (AR 17).  Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied review on January 10, 2005, making the ALJ's decision the final decision of the Commissioner.  (AR 3-5).  Plaintiff subsequently commenced the instant action.

\\

------

[1]  The statutory provisions governing SSI benefits are found at 42 U.S.C. § 1381 et seq.  SSI provides benefits for disabled individuals who are not covered under Title II or who are entitled to Title II benefits less than the amounts paid under SSI.  The determination of disability under Title XVI is similar to the disability determination under Title II.  However, unlike Title II, SSI does not require any showing of "disability insured status."  Harvey L. McCormick, Social Security Claims and Procedures, § 922 (4th ed. 1991).  Title XVI of the Social Security Act is codified at 42 U.S.C. §§ 1381-1385 ("Supplemental Security Income for Aged, Blind, and Disabled").

[2]  The Administrative Law Judge set an onset date of August 10, 2001, the date of Plaintiff's Supplemental Security Income application.  (AR 11).

[3]  After his denial, Plaintiff filed for reconsideration.  (AR 54).  Upon reconsideration Plaintiff alleged a worsening of his condition.  (AR 334).  However, Plaintiff failed to respond to requests for updates on his treating sources, therefore, the decision of reconsideration was based only on the evidence already in Plaintiff's file.  (AR 334).

1                              **FACTUAL BACKGROUND**

2

3        **A.   Plaintiff's Medical History**

4

5        Plaintiff was born on September 28, 1950 and was fifty-three years

6  old at the time of the hearing.  (AR 76).  He completed tenth grade and

7  has no other education or training.  (AR 93).  His past work experience

8  includes employment as a plumber.  (AR 88).  He claims that he became

9  disabled on July 24, 2001 due to coronary artery disease and bi-polar

10 disorder, depression, anxiety and panic attacks.  (AR 87).

11

12       Plaintiff's medical history includes treatment records from Dr.

13 Wendell Wettstein, a medical doctor.  (AR 122-27).  Plaintiff sought

14 treatment from Dr. Wettstein from January 17, 2000 to February 7, 2001

15 for various ailments including influenza, high blood pressure, chest

16 pains, and left ankle swelling and pain.  (AR 122-27, 129).  Dr.

17 Wettstein noted that Plaintiff, a smoker, suffered from psoriasis,

18 uncontrolled hypertension, depression, and possibly bi-polar disorder.

19 (AR 126).

20

21       Beginning on March 14, 2001, Plaintiff was treated by Dr. Venkat

22 Devineni, a cardiologist with Cedar-Sinai Health System's Heart & Lung

23 Institute of the High Desert ("Heart Institute").[4]  (AR 158).  Plaintiff

24 told Dr. Devineni that he has a history of hypertension, diabetes

25

26        [4]  Plaintiff was a patient at the Health Institute through at least

27 June 19, 2004.  (AR 363-67).  While Plaintiff saw various doctors while
   a patient there, Dr. Devineni was Plaintiff's primary care physician

28 through at least March 30, 2001.  (AR 298).

                                      3

mellitus, severe depression, anxiety disorder, psoriasis, and chronic nicotine use. (AR 158). Dr. Devineni scheduled tests for complaints of chest pain and to consider the possibility of coronary artery disease. (AR 159). He also referred Plaintiff to Dr. Tran for treatment of his psoriasis, and to Dr. Ahluwalia for treatment of his depression. (AR 159). On March 26, 2001, Plaintiff underwent coronary artery bypass graft surgery at St. Mary Medical Center. (AR 147). On May 1, 2001, Dr. Devineni noted that Plaintiff had stopped smoking and was doing "extremely well." (AR 145).

Plaintiff visited Dr. Ali Ebrahim at St. Mary Medical Center on July 14, 2001, and followed up with Dr. Devineni on July 19, 2001. (AR 135, 137). At both examinations Plaintiff complained of constant chest pain, swelling in the left breast area, and depression. (AR 135, 137). Upon conducting a physical examination, Dr. Devineni did not find any problems. However, he referred Plaintiff to a psychiatrist. (AR 135).

On July 25, 2001, Plaintiff was taken to the Canyon Ridge Hospital for major depression after he threatened to kill himself because his wife had left him. (AR 190, AR 195). The admitting physician, Dr. Mir Ali-Khan, assigned Plaintiff a Global Assessment of Function ("GAF") of 35 upon admission, and 45 upon discharge.[5,6] (AR 190). Dr. Ali-Khan

---

[5]   A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000) (hereinafter, "DSM IV").

noted that Plaintiff had been taking anti-depressants for ten years. (AR 195).

On August 1, 2001, Dr. Devineni wrote a letter indicating that Plaintiff was unable to handle his business matters due to his mental and physical health.  (AR 200).

On October 5, 2001, both Plaintiff and his ex-wife completed and signed a Daily Activities Questionnaire regarding Plaintiff.  (AR 96-107).   According to the questionnaire, with regard to grooming, dressing, cleaning, laundry, and maintenance, and the like, Plaintiff "can take care of himself."[7]  (AR 97-98, 102-03).  He prepares his own meals, occasionally goes to the grocery store, and when he has money he pays his own bills.  (AR 97-98, 103-04).  Plaintiff leaves his house daily without the need for assistance, and he has a driver's license and a car which he uses for transportation.  (AR 98, 104).  In addition,

A GAF of 31-40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."   American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. rev. 2000).

A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  <u>DSM IV</u> at 32-34.

[6]  At another point in his evaluation, Dr. Ali-Khan assigned Plaintiff a GAF of 30.

[7]  According to Plaintiff, however, he does not always finish his household chores.  (AR 106).

Plaintiff stated that at the time he was not taking any medications. (AR 106).

On November 9 and 11, 2001, Plaintiff saw Dr. Siva Arunasalam, a cardiologist, at St. Mary Medical Center.  (AR 205, 208).  Dr. Arunasalam noted Plaintiff's chest pain, coronary artery disease, hypertension, and chronic obstructive pulmonary disease.  (AR 206).  He also reported that Plaintiff had been smoking three packs of cigarettes per day and drinking a twelve pack of beer per day, and was going through alcohol withdrawal as a result.  (AR 206).  He further noted that Plaintiff's alcoholism contributed to his hypertension and "[he] once again stressed the need for [Plaintiff] to discontinue smoking and alcohol use."  (AR 206).

Although he does not appear to have seen Plaintiff since July 19, 2001 when a physical examination revealed no problems, Dr. Devineni wrote in a letter dated December 27, 2001, that Plaintiff was diagnosed with coronary artery disease, post coronary artery bypass grafting, anxiety, depression, and hypercholesterolemia and that in his "medical opinion" Plaintiff is "totally and permanently disabled."  (AR 293).

In February and March, 2002, Plaintiff saw various doctors at St. Mary Medical Center complaining primarily of headaches.  (AR 298, 301, 306, 314).  Each of the doctors noted that Plaintiff was noncompliant with medical instructions.  (AR 298, 301, 306, 314).

On February 1, 2002, Plaintiff saw Dr. Dennis Wheeler, complaining of headaches.  (AR 314).  He told Dr. Wheeler that he had not been

6

taking his medications for hypertension and that his chest pain was so mild he did not need to take his medication for it.  (AR 314).   He denied having any chest pains at the time of the appointment. (AR 314). Dr. Wheeler diagnosed the headaches as resulting from stress or tension and explained the risks of Plaintiff not taking his hypertension medications.  (AR 315).

On March 5, 2002, Plaintiff saw Dr. Devineni, complaining of fatigue and only occasional chest pain. (AR 306).  Plaintiff told Dr. Devineni he had not been taking any of his medications, and he had not seen his regular doctors for follow-up visits.  (AR 306).

On March 28, 2002, Plaintiff saw Dr. Wheeler, again complaining of headaches. (AR 301).  Dr. Wheeler diagnosed the headaches as resulting from drinking alcohol. (AR 301).  Plaintiff told Dr. Wheeler that he had not recently had any chest pain.  (AR 301).  During the visit, Plaintiff's breath smelled of stale alcohol and he admitted to smoking heavily and drinking that day.  (AR 301).  Plaintiff also told Dr. Wheeler he had not taken any of his medications and "he just is not into following his medical direction."  (AR 301).  Dr. Wheeler reported giving Plaintiff "stern counseling" for his "severe noncompliance." (AR 302).

On March 30, 2002, Plaintiff saw Dr. Daniel Quion, complaining of headache and dizziness, but again denied having any chest pain.  (AR 296, 298).  According to Dr. Quion's report, Plaintiff suffered a head injury approximately eight months earlier.  (AR 298).  Dr. Quion reported that Plaintiff was seen the previous week for uncontrolled

1  hypertension, but that he checked out against medical advice.  (AR 298).
2  Plaintiff told Dr. Quion that he had not taken any medication since.
3  (AR 298).

4

5  Beginning February 20, 2003, Plaintiff saw Dr. Douglas Wilkinson,
6  a cardiologist with Ventura Cardiology Consultants, for treatment of his
7  high blood pressure and coronary artery disease.  (AR 338).  Dr.
8  Wilkinson prescribed antihypersensitive medications and noted on March
9  25, 2003 that Plaintiff was improving.  (AR 338).

10

11  On July 14, 2003, Plaintiff was examined by Dr. Tsu Lai at St. Mary
12  Medical Center.  (AR 395).  At this examination, Plaintiff reported that
13  he drank beer and was smoking up to three packs of cigarettes per day.
14  (AR 398).  He told Dr. Lai that a stress test from four months prior
15  showed that his heart is fine.  (AR 398).

16

17  On June 19, 2004, Plaintiff admitted to smoking four packs of
18  cigarettes per day during an appointment at St. Mary Medical  Center.
19  (AR 365).  On August 19, 2004, Plaintiff saw Dr. Omer Ahmed at St. Mary
20  Medical Center.  (AR 345).  Dr. Ahmed concluded that Plaintiff's heart
21  was mildly enlarged.  (AR 349).  On August 21, 2004, Plaintiff was
22  examined at Loma Linda University Medical Center.  (AR 344).  Plaintiff
23  told the doctor that he was still smoking, and the doctor counseled
24  Plaintiff on quitting smoking.  (AR 344).

25  \\

26  \\

27  \\

28

8

1       **B.   <u>Consultative Examinations</u>**

2

3       On October 25, 2001, Dr. Albert Lizarraras, a medical doctor,
4  assessed Plaintiff's residual functional capacity ("RFC"). (AR 264-72).
5  Dr. Lizarraras concluded that because of Plaintiff's chest pain and
6  hypertension, he had a light RFC.  (AR 272).  Dr. Lizarraras also
7  determined that Plaintiff was not significantly impaired with regard to
8  persistence, intensity, or pace.  (AR 272).

9

10      On November 15, 2001, Dr. John Woodard, a neurologist and
11 psychiatrist with the Department of Social Services, conducted a
12 complete psychiatric evaluation of Plaintiff. (AR 260-63). Dr. Woodard
13 concluded that Plaintiff suffered from a depressive disorder, passive
14 aggressive personality disorder, slight to moderate psychosocial
15 stressors, and fair adaptive functioning.  (AR 263).  He further noted
16 that Plaintiff is capable of handling is own funds, and his conditions
17 would likely improve with appropriate treatment and abstinence from
18 alcohol.  (AR 263).

19

20      On December 12, 2001, Dr. Ernest Giraldi, a medical doctor,
21 assessed Plaintiff's functional abilities.  (AR 273-91).  On a scale
22 ranking degree of limitation as "none," "mild," "moderate," "marked," or
23 "extreme," Dr. Giraldi found that Plaintiff was only mildly limited in
24 the activities of daily living, mildly to moderately limited in his
25 abilities to maintain social functioning, and mildly limited in his
26 ability to maintain concentration, persistence, or pace.  (AR 284).
27 With regard to understanding and memory, he found Plaintiff was not
28 significantly limited in any category, except that he was mildly limited

9

in his ability to understand and remember detailed instructions.  (AR 288).  He also determined that Plaintiff was not significantly limited in his ability to sustain concentration and persistence except that he was mildly limited in his ability to carry out detailed instructions. (AR 288).  Dr. Giraldi concluded that Plaintiff was not significantly limited in his ability to socially interact, except that he was mildly limited in his ability to interact appropriately with the general public.  (AR 289).  Finally, Dr. Giraldi concluded that Plaintiff was not significantly limited in his ability to adapt to situations.  (AR 289).

## C.   **Plaintiff's Testimony**

On September 10, 2004, a hearing before the ALJ was held.  (AR 22). At the hearing, Plaintiff testified that he was employed the previous year as a plumber, but within the year he was laid off because he was too slow and had trouble finding street addresses.  (AR 28).  He further stated that he did not think he could do plumbing work as of the time of the hearing due to his physical and mental conditions.  (AR 37). Because he felt he could not work, he admitted that he had not looked for work since his last job.[8]  (AR 44).

Plaintiff further testified that since his heart surgery he suffered heart attacks, shortness of breath, and daily chest pain.  (AR

---

[8]   However, he also testified that he told the Department of Employment that he had in fact looked for employment during that time. (AR 44).

10

29-31).  In addition, his ankle swelled up every day and his chest would sometimes get swollen.  (AR 31-32).  Plaintiff told the ALJ that mentally he suffered from bipolar disorder, panic attacks, and he sometimes felt suicidal.  (AR 33-35).  He also testified that he had not taken some of his medications because he could not afford them.[9]  (AR 39).

Plaintiff testified that he had not had a drink in a few months. (AR 37).  He stated that his daily activities include sitting in his truck, reading, sometimes shopping, and preparing food.  (AR 40).  He stated that he does not do housework, but he does wash dishes and occasionally does laundry.  (AR 40-41).

### D.   **Vocational Expert's Testimony**

Mr. Joseph M. Mooney, an independent vocational consultant, testified at the September 10, 2004 hearing as a vocational expert.  (AR 41).  The ALJ proposed a hypothetical involving a claimant who had a tenth grade education, was closely approaching advanced age, and had no past relevant work.  (AR 42).  The hypothetical claimant was able to lift twenty pounds occasionally, ten pounds frequently, could sit, stand, or walk up to six hours in an eight hour work day, could not work at heights, and could only occasionally balance, stoop, kneel, crouch, or crawl.  (AR 42).  In addition, the ALJ noted that the hypothetical \\

---

[9]  However, Plaintiff went on to state that he had only once applied to a financial assistance program for money to pay for his medications. (AR 40).

11

claimant could only perform simple, routine, repetitive, non-public tasks.  (AR 42).

Mr. Mooney found that such a claimant could find work as a light exertion level assembler, or in manufacturing as a handpackager, sorter or grader.  (AR 42).  According to Mr. Mooney, there were in excess of five thousand of these jobs in Los Angeles, Orange, Riverside, and San Bernardino counties.  (AR 42).

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[10] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

---

[10]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. §§ 404.1520(b) - 404.1520(f)(1) & 416.920(b) - 416.920(f)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54 (citing Tackett).  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking

13

into account the claimant's residual functional capacity,[11] age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**THE ALJ'S DECISION**

ALJ Varni concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 17). At the first step, he found that Plaintiff had no relevant work experience. (AR 11). At the second and third steps, the ALJ found that Plaintiff suffered from a severe impairment of the cardiovascular system, but not one that met a listed impairment. (AR 11).

Next, at step four, the ALJ adopted the findings of the State Agency psychiatrist. (AR 12). Accordingly, the ALJ found that Plaintiff was capable of performing at least simple, routine,

---

[11]  Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

repetitive, non-public tasks, occasionally lifting twenty pounds, frequently lifting ten pounds, and standing and/or walking, and sitting for six hours of an eight hour day. (AR 12). He found Plaintiff was limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and cannot climb ladders, ropes, and scaffolds. (AR 12). Finally, he noted that Plaintiff had mild restrictions of the activities of daily living, mild to moderate difficulty maintaining social functioning, mild difficulty maintaining concentration, persistence, and pace, and no episodes of decompensation. (AR 12). The ALJ further noted that Plaintiff's testimony was vague, unresponsive, self-serving, and unsupported by the record. (AR 15). He also described Plaintiff's medical records, and specifically rejected Dr. Devineni's opinions from August 1 and December 27, 2001 because the conclusions were, among other things, unsupported and inconsistent with the record. (AR 14).

Finally, at step five, the ALJ concluded that based on Plaintiff's residual functional capacity, and the testimony of the vocational expert, Plaintiff could perform work as an assembler, a packager, and a sorter. (AR 15-16). Accordingly, the ALJ found that Plaintiff was not disabled, as defined in the Social Security Act, at any time through the date of the decision. (AR 16).

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error

or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**DISCUSSION**

A.   **The ALJ Fully and Fairly Developed the Record**

Plaintiff contends that the ALJ did not fully develop the record because he did not indicate the basis of Plaintiff's disability in 1995 and the basis of the termination of Plaintiff's benefits in August 1999. (Jt. Stip. at 2-3). He argues that such evidence is "clearly relevant \\

16

since [he] is claiming disability based upon longstanding conditions that prevent hi[m] from working successfully." (Jt. Stip. at 3).

The ALJ has an affirmative duty to fully and fairly develop the record, even when the claimant is represented by counsel. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001). The duty is heightened when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests. <u>Id.</u> However, only ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry or gather additional information. <u>Id.</u> <u>See also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th Cir. 2002) (duty not triggered where the ALJ did not make a finding that the medical report was inadequate to make a disability determination). Here, the ALJ's duty was not triggered.

In this case, there were no ambiguities or inadequacies in the record requiring clarification. In fact, Plaintiff does not argue that this is the case. Instead, he asserts that the ALJ's failure to discuss in more depth Plaintiff's successful SSI application and subsequent termination has rendered the record not fully developed. He argues that this information is relevant because he is claiming disability based upon a longstanding condition that has prevented him from working.[12]

---

[12]  It should also be noted that Plaintiff does not contend that the prior application would prove that his current problems are worse than what the records in the administrative record show. He merely asserts that such an inquiry would be relevant to Plaintiff's current claim. However, mere conjecture or speculation that additional evidence might have been obtained is insufficient to warrant a remand.

1

2       As there is no ambiguity or inadequacy of the record, the ALJ is

3  not required to make the inquiry suggested by the Plaintiff.  Moreover,

4  as the ALJ noted in his decision:

5

6       [A]s provided in SSR 83-20, it is unnecessary to consider

7       whether [Plaintiff] was 'disabled' prior to the protective

8       filing date of [Plaintiff's] current Title XVI supplemental

9       security income application.  This is because the law does not

10      provide for retroactive benefits under Title XVI.  Benefits

11      are payable only from the filing or protective filing date of

12      the application.  Therefore, this decision will only discuss

13      [Plaintiff's] eligibility for supplemental security income

14      based on the current Title XVI application.

15

16  (AR 11).  The issue before the ALJ was whether Plaintiff was disabled by

17  his longstanding conditions as of the time of his current application.[13]

18   Accordingly, the Court finds that the record was not inadequate for the

19  ALJ to make his decision.  Therefore, Plaintiff's argument that the

20  record was not fully developed is without merit.

21  \\

22  \\

23  \\

24  _____

25      [13]  As a matter of fact, further inquiry into these records would
26  likely be to Plaintiff's detriment as his benefits based on the same
   longstanding condition were terminated in 1999 and a subsequent
27  application made in 1999 was denied in 2000.  Notably, Plaintiff did not
   appeal his 1999 application beyond an application for reconsideration.
28  (AR 11, 273).

**B.**   **The ALJ Gave Specific And Legitimate Reasons For Rejecting The Treating Physician's Opinion**

Plaintiff also contends that the ALJ improperly disregarded the opinion of his treating physician, Dr. Devineni.  Specifically, he asserts that the ALJ failed to consider Dr. Devineni's opinion that Plaintiff "is totally and permanently disabled."  (Jt. Stip. at 4). Plaintiff argues that the ALJ's stated reasons for not giving weight to this opinion are error.  (Jt. Stip. at 4-5).

Generally speaking, the court must attribute greater weight to the opinions of treating physicians because they are hired to treat the patient and consequently have more interaction with the individual. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citing Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)).  However, while a treating physician's opinion may be entitled to more deference, it is not entirely conclusive as to the question of disability.  Magallanes, 881 F.2d at 751 (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989)).  The ALJ may choose to disregard or give less weight to a treating physician's opinion, so long as he "make[s] findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."  Magallanes, 881 F.2d at 751 (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).

In his opinion, ALJ Varni stated that he "considered and rejected" Dr. Devineni's opinion dated December 27, 2001, and gave four reasons for this decision.  (AR 14).  First, he found the opinion had no "citation of clinical or diagnostic findings supporting such a broad

19

conclusion of disability." (AR 14). Second, he noted that "Dr. Devineni has apparently not seen [Plaintiff] since his coronary artery bypass graft in 2001 and his opinion has no currency." (AR 14). Third, ALJ Varni stated, "[Dr. Devineni's] assessments are unsupported, he does not indicate any restrictions, and his assessments are inconsistent with the evidence of record." (AR 14). Fourth, and finally, he found that "the conclusion that [Plaintiff] is unable to work is on an issue that is reserved for the Commissioner, therefore, is not worthy of persuasive value." (AR 14). As these reasons are specific, legitimate, and supported by substantial evidence in the record, the Court finds ALJ Varni properly rejected Dr. Devineni's opinion of disability.

Plaintiff argues that Dr. Devineni's opinion, as stated in his letter of December 27, 2001, was not properly evaluated, and, thus, the case should be remanded. (Jt. Stip. at 6). However, the medical opinion to which Plaintiff refers is a half-page letter that is inconsistent with Plaintiff's medical history as well as his lifestyle. (AR 293). The letter simply lists Plaintiff's various diagnoses, which are also included in Plaintiff's medical reports, and then summarily concludes "It is my medical opinion that [Plaintiff] is totally and permanently disabled. Your cooperation in assisting [Plaintiff] in whatever manner possible is greatly appreciated. If I may be of any further assistance, please do not hesitate to contact me." (AR 293). ALJ Varni properly rejected this conclusion as it is largely inconsistent with the rest of Plaintiff's recorded medical history.

The record does not support Dr. Devineni's conclusion. It is broad and unsubstantiated as reflected by the fact that he is the only doctor,

out of the several who treated Plaintiff, to indicate that Plaintiff was totally and permanently disabled. In fact, he contradicts his own opinion. In a medical record, as compared to the letter containing this conclusion, Dr. Devineni found Plaintiff was doing "extremely well" in the months following his surgery. (AR 135). Another doctor, Dr. Wilkinson, noted on March 25, 2003 that Plaintiff was improving with antihypersensitive medications. (AR 338). Dr. Woodard, a consulting neurologist and psychiatrist with the Department of Social Services, found that Plaintiff's condition would likely improve with appropriate treatment and abstinence from alcohol. (AR 263). Moreover, several reports noted that Plaintiff was binging on tobacco and alcohol against medical advice. (See e.g., AR 206, 301, 344, 398). Other reports indicated that Plaintiff was noncompliant with medical instructions. (See e.g., AR 298, 301, 306, 314).

In addition, Dr. Albert Lizarraras, a consulting medical doctor who assessed Plaintiff's residual functional capacity ("RFC"), found that Plaintiff maintained a light RFC despite his chest pain and hypertension. (AR 272). He further stated that Plaintiff was not significantly impaired with regard to persistence, intensity, or pace. (AR 272). Dr. Ernest Giraldi, a consulting medical doctor, also assessed Plaintiff's functional abilities. He concluded that Plaintiff was only mildly limited in the activities of daily living, mildly to moderately limited in his abilities to maintain social functioning, and mildly limited in his ability to maintain concentration, persistence, or pace. (AR 284).

\\

\\

21

1    Finally, Dr. Devineni's conclusion is also inconsistent with
2    Plaintiff's lifestyle.  According to the Daily Activities Questionnaires
3    of both Plaintiff and his ex-wife, Plaintiff takes care of himself, does
4    his household chores, and shops and cooks for himself.  (AR 96-107).  He
5    takes care of his own funds, and has a valid driver's license and a car
6    which he uses for transportation.[14]  (AR 96-107).

7

8    Accordingly, the ALJ did not err in rejecting Dr. Devineni's
9    opinion of December 27, 2001.  The ALJ provided specific and legitimate
10   reasons for this decision, and the overwhelming concurrence between the
11   reports of the other treating physicians as well as the consultative
12   evaluations, serve as substantial evidence for this conclusion.

13   \\
14   \\
15   \\
16   \\
17   \\
18   \\
19   \\
20   \\
21   \\
22   \\
23   \\

24   _____

25       [14]  ALJ Varni further supported his rejection of Dr. Devineni's
     opinion by noting that Dr. Devineni's opinion "has no currency."  (AR
26   14).  The ALJ comes to this conclusion because Dr. Devineni, himself,
     appears to have last treated Plaintiff in July, 2001.  (AR 135).
27   Regardless, ALJ Varni's decision to reject Dr. Devineni's opinion stated
     in the December 27, 2001 letter is supported by specific and legitimate
28   reasons as discussed above.

1                              **CONCLUSION**

2

3          Consistent with the foregoing, IT IS ORDERED that Judgment be

4   entered AFFIRMING the decision of the Commissioner and dismissing this

5   action with prejudice.  IT IS FURTHER ORDERED that the Clerk of the

6   Court serve copies of this Order and the Judgment herein on counsel for

7   both parties.

8

9

10  DATED: March _14_, 2006.

11

12

13                                        _____/s/_____

14                                        SUZANNE H. SEGAL
                                          UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28